JOHN H. LETTS

*v.*

MAY E. NEWBRAND LETTS.

[Decided April 9th, 1909.]

The rule requiring corroboration of the evidence of a party to a suit for divorce on the ground of adultery—*Held*, to be satisfied by the testimony in this suit.

---

*Mr. Warren R. Schenck,* for the petitioner.

*Mr. Freeman Woodbridge,* for the defendant.

HOWELL, V. C. (orally).

I think the question on the original petition is a question of fact wholly, and that there is no question of law in it which has not been pretty thoroughly settled by the decisions in our own

state. Of course, it is well settled that a divorce cannot be granted upon the uncorroborated evidence of a party. It is likewise very well settled that a divorce will not be granted upon the confession or unsupported testimony of the co-respondent; but it is likewise settled, as I understand it, in the *Delaney Case,* 69 *N. J. Eq.* (*3 Robb.*) 602, in the opinion of Vice-Chancellor Emery, that the testimony of the co-respondent may be used for the purpose of corroborating the testimony of a party, and of course it must be *vice versa;* where a party gives the original testimony it may be supported by that of the co-respondent. Now, in this case, we have the testimony of the co-respondent which is exactly to the point. I do not know that I need go into the details of it very much. He says that on March 17th, 1908, he called at Mrs. Letts' house; that that appointment was made the day before, as I recall the testimony; that in pursuance of the appointment he went to her house about half-past eight or quarter to nine o'clock on the evening of March 17th, he knowing at that time that the husband was to be away, having been told so by her, so his statement is. He went to the front door, and at his knock or call she opened the door and let him in and took him into the kitchen. She likewise says that the door was locked, the key was in the door, and I suppose at that time that she meant the kitchen door was locked and that the key to the kitchen door was in the door inside. Then Connett details the circumstances under which he committed the act of adultery complained of, and tells how he heard the knocking on the door and the attempt of someone to get into the house and how she pointed the way to him to go to the cellar. He likewise tells how the husband eventually came down into the cellar and hauled him out by his coat collar and brought him upstairs and took him out of the front door and took him over to one of the neighbors. If that testimony is true there cannot be any doubt but what the crime of adultery was committed by this woman and that her husband would be entitled to a divorce against her. As I said before, in its uncorroborated condition, the decree cannot be made upon it. Now, the husband comes with his statement, and that is put in as a corroboration of the statement of the co-respondent. He says that he came home about nine o'clock and

he went in his usual manner to the kitchen door. He found a low light burning in the kitchen. The kitchen door was locked; the key was not in its accustomed place on the outside. He attempted to get in, but could not. He went to the front door and attempted to get in there; then again to the back door; then again to a position where he could watch the front door and the back door; and shortly after his wife let him in. He tells further about the finding of this man Connett in the cellar, and what he did with him. Now those two stories are so nearly alike that I must say that the story told by the husband is wholly corroborative of the story told by Connett, although the husband is unable to say that he saw the act of adultery committed, or that he did very much more than merely suspect that it had been done that night. I have hesitated, and feel a hesitation, now about advising a decree for a divorce on the testimony of those two people; but there is a matter of corroboration in the case that I think is quite important—two matters: One is the letter which is addressed "Dear Danny." Now, that was found by the husband several months before the alleged adultery; it was found by him on December 12th, 1907. Mrs. Letts denies writing the letter. There is, however, produced before the court a specimen of her handwriting in a copy book which she admits to be her handwriting, and I have in the course of the hearing compared the writing of the "Dear Danny" letter with the writing in the copy book, and to my mind there is no doubt whatever but that the letter and the writing in the copy book were from the same hand. That letter was found by the husband in the bedroom in an envelope unaddressed, and apparently never having been delivered. He thinks it is addressed to a man Daniel Keegan, with whom he has on one or more occasions seen his wife in conversation. Now, that letter could never have been written by a woman whose mind was not to some extent alienated from her husband and probably corrupted by evil communications with the man to whom it was addressed. I do not think that any virtuous, chaste woman writes that kind of a letter without having behind it as a motive or an incentive either the guilt of adultery or the desire to commit adultery, or the willingness to do it in case the man addressed should propose it.

And another matter which is of great importance in this case to my mind is the finding of the ten or dozen postal cards which were put in evidence. These were found by the petitioner in his own house, and he says that he did not bring them there. Mrs. Letts says that they were brought there by her sister Mrs. Fox and left there. They are, to my mind, very indecent. I cannot imagine a pure-minded, chaste woman leaving those cards in her house where they were liable to get into the possession of the children, unless that woman was a woman of very easy virtue. Those seem to me to be all corroborative of the statement made by Connett, because I think they show a condition of mind which is favorable to the commission of the crime that has been charged.

Now, it is said by way of defence, that the circumstances from the wife's standpoint seem to indicate that there was some sort of trap laid by the husband for the wife to fall into; that there was collusion between him and Connett by which the wife was placed in a situation in which she might be charged with the matrimonial offence. That makes no impression upon my mind, and that for a reason which is very evident and which was adverted to by counsel for the petitioner in the argument. If it had been a case of collusion put up by a detective and the husband, or put up by any of the husband's advisers, there certainly would have been present at the time of the discovery a sufficient number of witnesses to have made the thing certain and sure. I do not think even the dullest detective would have omitted to provide witnesses—and it seems to me that the charge of collusion falls right at that point. The charge of collusion includes assent, acquiescence and willingness on the part of the husband that the wife should commit the offence for the furtherance of his own purposes.

Now to meet the main case of the husband the wife makes denials, but I do not think that they go to the full extent of meeting the proof adduced on the part of the petitioner. She not only makes these denials, but she files a cross-petition for a limited divorce on the ground of cruelty. I am unable to see the situation in the same light as does the counsel for the defendant. There are no acts of cruelty charged, as far as I remember the evidence, within three or four years of the time when the wife

finally left the husband's house on March 30th, 1908. She did not testify that the acts of cruelty continued right down to the time of their separation, and that she finally separated from him on account of the continuance and repeated and horrible acts of cruelty. She appears to me to have exaggerated the situation. I think it is probably true that he called her names and that he may have beaten her; I think he may have done things that a more considerate man would not have done, but they seem to me to be isolated instances not to be so connected as to be called a continuous gross abuse or cruelty; and I therefore think that not only is the cruelty not a bar to the petitioner's case, but it is not a ground for a limited divorce.

Now, I have not gone over this testimony as fully as counsel have; I am giving only my notion of the result of it. If an appeal should be taken I might consider it advisable to go over the testimony carefully, and I might have to have the testimony written out.